Next case we're going to hear is Oscar Pacas-Renderos v. Sessions and Ms. Masumi. I guess we'll hear from you first. Good morning, your honors. May it please the court, my name is Miriam Masumi and I'm appearing today on behalf of Oscar Renderos Pacas, petitioner. Mr. Pacas is a native and citizen. You call him Renderos Pacas or Pacas-Renderos? And I looked through the record and not only is it both ways, but he has done it both ways. Yes, he has, your honor. And I do interchange at times, so I do apologize, but I will be consistent and go forward and say Pacas-Renderos. Okay. Thank you. Why? I don't understand that. Why is it interchanging? Is that cultural or whatever? I mean, I think he has had various aliases as the record demonstrates and I think it has been interchanged, but his correct name is Pacas-Renderos. Okay. Yes, your honor. Mr. Pacas- He said under oath the other way. He said Renderos Pacas. That's probably the name that he used. But then he signed an application under oath and he said this way. Yes, that's correct as well, your honor. So we've had some- Fine, whatever you wish. Thank you. Mr. Pacas-Renderos is a native and citizen of El Salvador. In September 2008, three days after Mr. Pacas-Renderos was deported, he suffered a vicious attack by members of the extremely dangerous MS-13 gang. After he refused to join the gang and expressed that he was against their criminal activities and that he was not a violent person, this attack was so vicious that it resulted in significant paralysis to the left side of his face as well as other severe injuries and- I gather he was given two choices, to give him money or to join the gang. He couldn't give him money and he didn't want to join the gang. That's correct, your honor. That is exactly what happened. I know we've had these MS-13 cases up numerous times and I think the immigration people have trouble with it too. It usually comes down to the social group issue. It's one of these areas of the law that is most difficult because there is no question that he's been exposed to a lot of danger from that gang and he's also gotten himself into some trouble here. But what the appropriate method for handling this type of stuff is, it sort of falls into the cracks. I don't quite know what the appropriate response is because you hate to send somebody exposed to a gang that is targeting him perhaps. At the same time, you wonder what section of the act protects or allows people like that to stay in the United States. I'll let you make your argument, but I can tell you I find these cases with the MS-13 difficult. I've had quite a few of them. I agree with you, your honor. These are very difficult cases and there is various case law that tries to make sense of it. One argument that I would like to put forward today is that the immigration judge and the Board of Immigration Appeals who adopted the decision of the immigration judge found that Mr. Pacas did establish persecution and he did establish that he would experience torture if returned to El Salvador. On the persecution issue though, the issue becomes, is it MS-13 persecution or is it state persecution? Was it acquiesced in by the state and they found that it was not a policy of the state to try to fight the gangs, they just don't have the full resources. And of course there is some local corruption evidence of that too, but that's hard to know when you run into a corrupt police officer or not. I think we both understand the difficulties of the case. My question is, you're asking us to, I guess, reverse the BIA. Well, your honor, I am also asking for the case to also be remanded to the BIA to consider the argument that Mr. Pacas presented to the immigration judge which was that he has a well-founded fear of future persecution on the basis of his kinship ties to his two cousins that were murdered. The proposed social group that he put forward was members of the Renderos family. There's no evidence to suggest that the threats against him were based on his cousins. That was just a fact that he pointed out, but I don't think there's evidence of any nexus to those. He was pretty clear throughout that he didn't want to join the group and the group will not let that happen. You either pay extortionary monies or you join the group and get your tattoo and all that business. He didn't want to do that rationally, properly, and one of the ways the gangs enforce it. And, of course, once you're in the gang, you can't quit or you'll get killed. And that continues in the United States, around the Washington area and Los Angeles and Long Island. There's pockets up here that are pretty strong. That's what I think when we use this word, difficult cases. I'm not so sure we're talking about it as difficult in terms of the law. It's difficult in terms of the application of that law. The law is pretty clear in terms of what Congress has done. They made this review really tight, and so the outcome may be as Judge Niemeyer described, we know he's been beaten up. We know he's in the back, but it's difficult in that it just seems like it's not a good thing. But I'm not sure it's difficult from determining what to do. Maybe I'm misreading that, but when we're talking social group, for instance, and what Niemeyer is alluding to in terms of the nexus here, it's just not there. It doesn't look like to me he's being attacked. It's his money, and he didn't want to be a part of it, but it's not the family. It looks like it's the evidence that's given rise to this. Well, Mr. Pacas conceded in his opening brief that the initial interaction that he had with MS-13 may not have been a count on his kinship ties. It was after his two cousins that were murdered that he felt a well-founded fear of returning to El Salvador as a basis of being related to them. Is that enough to feel it? Well, MS-13 and the record shows that MS-13 actually threatened the entire family after one of these cousins was murdered, causing the entire family to flee to Mexico. So that threat, coupled with the murder of these cousins, gave rise to a well-founded fear of future persecution. And the critical point is that the immigration judge did not address this argument. He misconstrued the argument and stated that Mr. Pacas did not demonstrate that one central reason for his persecution in El Salvador was on the basis of his kinship ties. But that's not what Mr. Pacas was arguing. He was arguing that he has a well-founded fear of future persecution, and the board adopted that. The language, in fact, that the board used in their decision was that Mr. Pacas had not demonstrated that family membership was at least one central reason for his mistreatment. And that, again, is not what Mr. Pacas was arguing. The mistreatment that he suffered in his country, he concedes in his opening brief, may not have started with his kinship ties. But after his family members were murdered and threatened, that's where the well-founded fear arose. And this court has held in Cordova v. Holder and Creston-Valadares, and even more recently in the March 2017 case of Cantilani v. Cruz, that members of an extended family, maybe they weren't targeted or harmed, but that doesn't undermine the applicant's own fear of future persecution. Have you issued any opinion that has allowed, accepted your argument with respect to MS-13? It seems to me every case has come out pretty much the same way on these, and it's a little bit exactly what Judge Winn was saying. The application of the law isn't that unclear. It's the application that is undesirable, so to speak. Undesirable with respect to his risk. Well, yes, Your Honor. I mean, Hernandez v. Avalos, that was a case involving MS-13 where a mother was targeted for refusing to allow her son to join a gang, and this court found that one central reason for her persecution was on the basis of her kinship ties to her son. Cordova v. Holder. Yeah, but that's not this. The mother was being threatened for a relationship here. He candidly says he was threatened and punished because he wouldn't become a member. And I agree with that, Your Honor. In Hernandez v. Avalos, the persecution that was being looked at was past persecution. In this case, Mr. Pacas is arguing that he has a well-founded fear of future persecution on the basis of his kinship ties. I understand the theory, but is there any record evidence at all to support that? I mean, I know the gang has been making these phone calls to the family, but in none of those phone calls do they say anything like, like, we're after this guy because of the cousins. And that's correct, Your Honor. The phone calls don't distinguish. So you want us to send it back so the IJ can consider that there's no evidence? Well, I think, Your Honor, in this case, because the IJ did not consider this important part. And what record evidence do you want the IJ to consider that supports this argument? The fact that the MS-13 actually showed up to a funeral where one of his family members was threatened and threatened the entire family, of the entire Frenderos family, causing the family to flee. A brother of Mr. Pacas was actually also targeted by MS-13 when he visited the country in 2015, and they asked him to deliver a message to Mr. Pacas that they were looking for him. And also the fact that his two cousins were killed. So these are just some of the instances. I think because the board and the immigration judge failed to adequately address this important part of Mr. Pacas' claim that it should be remanded so that they could address it in the first instance. So it all comes down to, if those things actually happened, the question is, where is the evidence in the record that this gang was aware that he was related to either Samuel or Jose, or evidence that they harmed him because of his family? Jose knew he was in this gang. Where is that evidence in the record? That evidence in the record, Your Honor, it's more circumstantial, I think. I think, though, that it would be the board and the immigration judge's role to look at that in the first instance, since that had not really been looked at at all in the prior proceeding. Well, the position, that's part of the review, is when we take these things up here. We're fairly limited on this review. And if there's no evidence in the record, in other words, his family actually could be Christ persecuted, but they don't know he's a member of them. At least nothing in the record shows that. How do we connect the two? In other cases, you can get that, that there was a mother and a son and others in there. But in this case, it just doesn't seem to be there, that connection between this individual and this family. And that's all you need. You've got to have something there. That's correct, Your Honor. That is correct. The connection does have to be there, and I would just put forward that that would be up to the board and the immigration judge to look at the record evidence, since that's not something that was done. That's what I was saying. What are they going to look at? There's nothing there. The testimony that took place of Mr. Pacas specifically, that his two cousins were murdered, that the entire family was persecuted. I mean, the IJ did look at that, and I do understand that the IJ doesn't break out the distinction between past and future that you're talking about, but there's a lot of very kind of broad and non-categorical statements in here. Family ties do not appear to be even a tangential reason for persecution. I mean, they did look at that, and although they didn't use the exact sort of terminology of these two different ways of thinking about the problem, I totally agree with you there. The IJ does not say, look, there's two ways you can think about this, what happened in the past and what he's worried about now that the cousins are dead. But, I mean, you can certainly read the IJ as having just looked at everything and said, look, I don't see a nexus between family and persecution here, period. But I think the other thing, Your Honor, is that the IJ's analysis was that, the main focus of his analysis was that the family members that were threatened were not specifically harmed. For instance, his brother went to El Salvador and was not specifically harmed. He focused a lot on the fact that these members of the family weren't targeted for their relationship to Mr. Pacas, and this court has held that that necessarily does not have to be the case in order for an individual to have their own well-founded fear of future persecution. So that's what I feel the focus was on, rather than determining whether or not he has a well-founded fear of future persecution on the basis of his kinship ties. And I'd just also like to mention briefly that the immigration judge did find that Mr. Pacas had established that he'd be tortured if returned to El Salvador, but found that the government of El Salvador would not acquiesce in his torture. We submit that that was not correct reasoning. The immigration judge relied on Lozano v. Holder, which is the precedential case of this court, and in doing so essentially found that the Salvadoran government could not acquiesce in the torture of Mr. Pacas because they were making efforts to essentially stop gang violence. However, the regulations state that acquiescence has to be shown by a public official or an individual acting in a public capacity. An immigration judge put a high burden on Mr. Pacas to show that the entire was able to acquiesce in his torture. But you see the problem in the other direction. If there are some officers that are on the payroll, just as New York City police were on the payroll of the mafia, the question is whether he is going to be subjected to the work of that particular officer. If three members of a 25-person police force are on the payroll of MS-13, how does he say he's going to be at the government's acquiescence? He doesn't even know if those three are going to be involved in any enforcement. It's pretty speculative to pick out one corrupt police officer and say that, therefore, there is acquiescence in El Salvador. Your Honor, my time is up. May I ask a question? Yes, sure. Well, the regulations state that the focus is on a public official or a person acting in an official capacity. If there is an official or a few officials who are acting in a manner that acquiesces to an individual's torture, I would submit… We don't know that. We don't know that. All we know is there clearly are exceptions. There are people in the police force who are corrupt. There's evidence of that. And there's a non-acquiescence by the government as a matter of policy and effort. They don't have the resources. They have a terrible problem with these gangs, and everybody knows that. But the question of acquiescence has to be more than there are a few corrupt police officers. And I would encourage, Your Honor, to also look at the case of Mendoza-Sanchez v. Lynch. It's a Seventh Circuit case, and it deals with the country of Mexico. However, that court essentially found that the success of a government and their efforts to combat gang violence is more important than the effort that they put forward. And in that particular case, there were a few officials involved in the acquiescence of torture of the petitioner. And the court found that they were not just considered rogue officers, that the evidence showed that there was widespread corruption, widespread impunity within Mexico. And they remanded the case back to the Board of Immigration Appeals to see if this was enough to show acquiescence. There was not a focus on the entire government of Mexico, but rather these officials. And the reasoning in... I'm sorry, I actually, I take your point about sort of national versus local conditions and even individual experiences, but it did seem to me that the I.J. did consider the particular experience that this person had and sort of weighed the evidence about how sure can we be that the police failed to investigate this first thing that happened to him. I mean, what I took from the... the I.J. was very careful and thorough about this. And what I took from it was a sense that had the I.J. weighed the credibility and the evidence differently and thought that the police had failed, you could be sure the police actually didn't investigate this particular incident, it would have come out differently. So, I mean, there really was a very particularized individual analysis here, too. I wonder if you want to address that. Yes, Your Honor, very briefly I will. There was a particularized analysis. He did go into the fact that the police transported Mr. Palkus to the hospital and made those assessments. It is Mr. Palkus's position that even so, with those facts that were analyzed, the record evidence suggests that there is acquiescence in his particularized facts. But we don't do this part de novo, right? The I.J. made some determinations, and we just have to say, could any reasonable fact finder have weighed the evidence the way the I.J. did on what happened in this case? And it's hard to get past that. And, Your Honor, the I.J. does also have language in there that says the respondent has a high burden of proving the Salvadoran government would acquiesce in his torture, and then cited Lozano v. Holder and some other cases to suggest that the government of El Salvador is incapable of combating gang violence. He did do a particularized analysis and did weigh that. We would argue that substantial evidence in the record does not show that acquiescence existed, but there are no other questions, Your Honors. All right, thank you. You have some rebuttal. Thank you. Mr. Lutz. Good morning, Your Honors. May it please the Court, Alexander Lutz for the respondent. Your Honors, I understand the Court's sense that these are difficult cases, but the statute that Congress wrote and the statute that we're bound to enforce and uphold here is written in such a way that not every person who's experienced harm in their country of origin or who faces a risk of harm upon return is going to qualify for one of the narrow forms of relief and protection from removal that are provided by statute. Here before the agency, Mr. Pacos bore the burden to show clear probability, not just that he would be persecuted, but that a protected ground in the Immigration and Nationality Act would be a dominant and controlling motive for his persecutors to attack him. He bore the burden to show a clear probability, not just that he might be tortured, but that the Salvadoran government would acquiesce to it, that they would know about it and reach their duty to help, or that they would turn a blind eye. Now before this Court, Your Honors, Mr. Pacos has to show that the record is so compelling that no reasonable fact finder could deny him withholding of removal or cap protection. That's just such a high standard. We respectfully suggest Mr. Pacos can't meet it. Your Honors, I think with respect to the withholding of removal side of this case, the most important evidence here is Mr. Pacos' own testimony about what happened to him in the past and what he thinks is going to happen to him in the future. He testified as to what he thinks the motive of MS-13 was and will be. I'm looking at pages 124 to 125 of the administrative record. When he was asked, and I'm going to quote now, when he was asked, was there any other reason that they told you why they would want to hurt you other than wanting money or wanting him to join the gang, he said no, because that is their motive. They don't get what they want, they harm you. And then when he was asked, quote, and if you went back to El Salvador, why do you think they would want to harm you? He said, and I quote, because like I said before, they think I will act against them. Because to them I'm a threat. Because I escaped from them and I'm a threat to them. And he went on to clarify that the reason they might think he's a threat is because he could escalate his police report to a higher level and potentially start some trouble for the gang in that respect. That's the motive here. That's what Mr. Pock has testified. And so now he wants to connect that harm to a political opinion, real or imputed, to his membership in a particular social group, but respectfully the evidence just isn't there as Your Honor's questioning teased out during your questioning of opposing counsel. There's no evidence to connect his harm in the past or in the future to a political opinion. There's simply no evidence that the gang ever mentioned his political opinion, that they care about what his political opinion was. By the time he stated anything that even comes close to a political opinion, they were already inside the house. They already asked for him by name. They already tried to extort him. They already tried to force him to join the gang. They'd already targeted him before he opened his mouth. He makes an argument about his membership in a particular social group, Americanized non-community members, but we respectfully suggest that the agency got it right when they followed this court's precedent. That particular social group of Americanized people is foreclosed by this court's own precedent. It just squarely resolves that issue. He talks about his membership in a particular social group based on his family, the Renderos family. But Your Honor, Mr. Pock has conceded that nothing that happened to him in the past had anything to do with that. He says that on page 12 of his opening brief. So this is an entirely new claim. Regardless of anything happened to him in the past, it started from square one. He's got to show that he's going to be targeted in the future by MS-13, and that a dominant controlling motive for them to do that is going to be that he was related to these two cousins that got on the wrong side of the gang and were killed. There's just no evidence in the record that the gang even knows he's related to those people. There's no evidence that they've harmed any other members of the family because of their membership in this group. There's no evidence that he's been threatened with harm on this basis. None of the threats his family's received on his behalf said anything about being in the Renderos family. So we respectfully suggest that that claim fails as well. With regard to the Convention Against Torture aspect of this case, I think there's certainly evidence in the record that shows that some elements of the Salvadoran government are corrupt, and even though they're trying to stop the gang's violence, they're not always successful. But that really goes to whether or not he may be tortured at all, and the immigration judges already settled that question. So the remaining issue is whether the Salvadoran government is going to act quick, whether they're just going to roll over and let that happen, whether they're going to try to stop him from being tortured. And there's evidence in the record that shows that they would. There's evidence in the record that shows the Salvadoran government does care about this stuff. They're not always successful, but they're trying to stop it. And I could go through the whole litany of facts and support our position there, or I could just direct the court to the immigration judge at page 95 of the record, and to our brief at page 32 or 33. Judge Harris? Yeah, is it your position that unless sort of the government of El Salvador writ large is condoning this torture, it doesn't really matter what's happening at a local level? No, Your Honor, that isn't our position. And I think the court's opinion in Zelaya kind of speaks to that exact issue. It's possible for the Salvadoran government as a whole to have one position, and then for local authorities to acquiesce. But we would need some evidence in the case to show that that was going to happen here. And what would it look like? What would that evidence look like in your view? I mean, do you need, I know in the Zelaya case, there was an actual statement, like a police officer said, look, we're not going to protect you. Is that the kind of evidence you need? Well, Your Honor, I want to give you a straight answer to your question, but I'm hesitant to create a strict rule about a certain type of evidence that you need to have, or else if you don't have it, you lose. I think you just need to have some evidence at least, and Zelaya certainly shows where that threshold might lie. In Zelaya, a gang had fired a gun near the petitioner's head. The facts aren't really clear about exactly what happened there, but after that incident, he reported to a police station. He was bleeding from the head. He said, this just happened to me, and I need some help. MS-13's after me, and the police officer said, we're not going to help you because if we do, the gangs can come after us too. So I think the court got it right in Zelaya that where you have some facts like that, that does show that the local police are going to acquiesce. Well, what if the mother had stuck with her statement in her affidavit, that the police told her, we didn't open an investigation, this isn't something we're going to investigate? Well, Your Honor, I'm still not sure that that would be enough. We would need to know why the police officers didn't open an investigation. Is it because things weren't followed up on? Is it because they planned to circle back later? We would need to go a little bit further. Okay, what if the police say, we didn't open an investigation and we're not going to? Well, that certainly would be closer to helping Mr. Pox's position, but I still think we would need to know why. I mean, if we have the police say, we're not going to open an investigation because we don't want to get killed by MS-13 and we know that would happen, I think that would certainly help Mr. Pox's position. What you need is willful blindness, right? If they know he's being beaten to death by this gang, and they say, and we're not doing anything about it, you don't think that qualifies as willful blindness? I'm sorry, I don't mean to take you that far afield, but it does seem to me that the IJ just put a huge amount of weight on the fact that the mother's affidavit statement may well be enough for willful blindness. Let's just assume that for a minute. But then, up on the stage, she gets a little bit nervous and says, Well, sure, Your Honor, and I think the IJ certainly did mention that, but I would also respectfully draw the Court's attention to the immigration judge's citation of other specific items in the documentary evidence that Mr. Pox has submitted. There's the Department of State OSAC, the Overseas Security Advisory Council report that shows that there's an FBI transnational anti-gang unit helping the Salvadoran government here that police statistics show, and I'm quoting out from that report, police statistics show a decrease in annual homicides for the last two years attributed to a March 2012 truce between gangs. There's a subsequent report from the Associated Press that Mr. Pox cites in both of his briefs that says that that truce seems to be on shaky ground, maybe falling apart, but that same article also says that the government has implemented an aggressive crackdown, quote-unquote, and has moved gang members into high-security prisons in order to address the possible fallout from the truce failing. So I think Your Honor's right that the immigration judge did identify that there's not necessarily clear evidence about whether the police took a police report. In this case, that was one part of his analysis. I think that was just one part out of a much more comprehensive analysis that looked at the country conditions evidence that Mr. Pox put forward, looked at the fact that when the neighbors called the police after Mr. Pox was beaten, the police showed right up and drove him to the hospital. We just don't have the facts in this case to show a clear probability, let alone at this stage to compel the conclusion that if Mr. Pox goes back and faces a risk of torture, that the local police aren't going to help him. Not just that they would be unable to help him. That's not the standard. The standard is that they would willfully blind themselves to it happening or that they would know he's going to be tortured and just let it happen. They would just choose to let it happen. Therein is the answer to most of the questions. And that is because of the deferential standard. I know Jay had gone the other way on this. You may be facing a similar hurdle. It really is that Congress has just given so much authority to these immigration judges in terms of how they call it. We're pretty limited when it gets here. I think the judge could have called this the other way. And had he done so, you'd be facing very difficult arguments to see if it's hell to go the other way. Very high level. And for whatever reason, Congress has given it there. And that's why Judge Niemeyer alluded to the difficult situation we're put in because we are actually being almost likely to bring these cases up here. But once you can bring something that says it compels it, it's really taken a lot away in terms of the review of these cases. Well, that's true, Your Honor. But I'd point out that there are certainly cases where the court's been able to reverse the agency even under that deferential standard of review. So it doesn't operate as a complete bar. And furthermore, that high standard of review makes sense. I mean, the agency is, you know, they're professionals. They deal with immigration law every day. They see the demeanor of the witnesses. They examine all the evidence. And by the time it gets up here, we're looking at a cold record. And so certainly there are times when... That's a much higher standard than what we traditionally allow a union agency to do. We're looking at Chevron and lesser known Skidmore. This is a different type of review. But we need not debate this. The law is what it is. I think that's well put, Your Honor. The law is what it is. And absent some... Even if this record, as Your Honor put it, had evidence that could go either way, this Court said that's not enough. There's two permissible conclusions and the agency reaches one. That's it. Mr. Poncus has to show some evidence that compels reversal. And absent that, and there's really no evidence in the record to support his position, let alone compel reversal of the agency's findings, we respectfully suggest that the Court should deny the petition for review. Unless there are any questions from the panel, which I'm happy to answer. Thank you. Thank you, Your Honors. I'm assuming. Your Honors, I have no further rebuttal, but if there are any other questions from the Court, I'd be happy to answer them. All right, thank you very much. Thank you. I'll come down and greet counsel and proceed on to the last case. Thank you.
judges: Paul V. Niemeyer, James A. Wynn Jr., Pamela A. Harris